## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Amanda Martinez, Individually and as the Personal Representative of the Estate of Chandler Love, Deceased, | ) ) ) Case No. _____ |
| Plaintiff, | ) ) **Jury Trial Demand** |
| v. | ) ) |
| Abbott Laboratories, Inc.; and  Abbott Laboratories, | ) ) ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Amanda Martinez, Individually and as the Personal Representative of the Estate of Chandler Love, Deceased, hereby sues Defendants Abbott Laboratories, Inc., and Abbott Laboratories and alleges the following in support.

## NATURE OF THE ACTION

1.      This action arises out of the injuries and death suffered by premature infant Chandler Love ("Baby Chandler") who was fed Defendants' cow's milk-based infant feeding products. Defendants' products caused Baby Chandler to develop necrotizing enterocolitis ("NEC"), a life-altering and deadly disease that largely affects premature babies fed cow's milk-based infant feeding products. As a result of using Defendants' products, Baby Chandler was seriously injured, causing his death, as well as harm to his parent, Plaintiff Amanda Martinez.

2.      Defendants knew for years (before and after Baby Chandler's injuries and death) that their cow's milk-based infant feeding products caused premature infants (like Baby Chandler) to develop NEC which, in turn, resulted in catastrophic, life-altering injuries, and even death. Defendants not only concealed this knowledge from consumers (including Plaintiff), but they also misrepresented the relative safety of their products in their marketing and product packaging.

3.      Defendants told the world that their cow's milk-based infant feeding products were safe and beneficial for premature infants, knowing that that was untrue. Defendants knew that parents of premature infants (including Plaintiff) relied on them to provide accurate information about the safety of their products. Yet Defendants disabused that trust by concealing the truth and wrongly telling consumers their cow's milk-based products were safe for premature infants. Defendants compounded the problem by aggressively marketing their cow's milk-based infant feeding products to parents of premature infants.

4.      Just as Baby Chandler was a victim of Defendants' dangerously defective products, Plaintiff was a victim of Defendants' campaign to conceal and deceive the truth about their products.

5.      Accordingly, Plaintiff seeks to recover damages for the wrongful death of Baby Chandler that was directly and proximately caused by the Defendants' unreasonably dangerous cow's milk-based infant feeding products.

## PARTIES

6.     Plaintiff, Amanda Martinez, the mother of Baby Chandler is domiciled in and a citizen of Indiana and resides in Allen County Indiana. Amanda Martinez is the Personal Representative of Baby Chandler's Estate. Amanda Martinez brings this action for the wrongful death of Baby Chander, on behalf of the Estate and individual survivors thereof.

7.     Defendant Abbott Laboratories was at all times relevant hereto, and is now a corporation duly organized, incorporated, and existing under the laws of the State of Illinois with the principal place of business and headquarters in the State of Illinois and is thus a resident, citizen and domiciliary of Illinois.

8.     Defendant Abbott Laboratories, Inc., was at all times relevant hereto, and is now a corporation duly organized, incorporated, and existing under the laws of the State of Delaware with the principal place of business in the State of Illinois.

9.     Defendants, manufacture, design, formulate, prepare, test, provide instructions for, market, label, package, sell and/or place into the stream of commerce in all fifty states, including Illinois and Indiana, both infant formula and infant milk fortifier for premature babies under the Similac brand name. Defendants advertise that they provide the "#1 Formula Brand, Backed by Science" and claim to have "over 90 years of innovations" in infant formula.

## JURISDICTION AND VENUE

10.     This is an action for damages which exceeds the sum of $75,000.00 exclusive of costs, interest, and attorneys' fees.

11.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332, as complete diversity exists between Plaintiff and Defendants, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

12.     This Court has personal jurisdiction over Defendant Abbott Laboratories because this defendant resides in this District, and is incorporated under the laws of Illinois and is authorized to conduct business and does conduct business in the State of Illinois.

13.     This Court has personal jurisdiction over Defendant Abbott Laboratories, Inc. because this defendant resides in this District, and has its principal place of business and its headquarters in this District.

14.     Defendants have marketed, promoted, distributed, and/or sold their Product in the State of Illinois and Indiana, and Defendants have sufficient minimum contacts with this state and/or sufficiently avail themselves of the markets in the state through their promotion, sales, distribution, and marketing within this state to render exercise of jurisdiction by this Court permissible.

15.     Venue of this action is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events or omissions giving rise

to Plaintiff's claims occurred in this Judicial District. Further, venue is proper under 18 U.S.C. §1965(a) because Defendant Abbott Laboratories is headquartered in this District and because both Defendants transact substantial business in this District.

## FACTUAL ALLEGATIONS

**A.** **Chandler Love's Premature Birth, NEC Diagnosis, Injuries, and Death**

16.    Baby Chandler was born prematurely at the Parkview Regional Medical Center in Fort Wayne, Indiana, on September 26, 2015.

17.    Baby Chandler was fed Defendants' Similac cow's milk-based infant feeding products shortly after his birth.

18.    Shortly after Baby Chandler ingested Defendants' products, he developed NEC.

19.    Baby Chandler ultimately succumbed to his injuries and NEC diagnosis, passing away on December 4, 2015.

20.    At no point did anyone suggest in any way that Baby Chandler's NEC, his injuries, or his death were the result of consuming Defendants' products.

**B.** **Defendants Knew that Cow's Milk-Based Feeding Products Caused NEC**

21.    According to the World Health Organization ("WHO"), babies born before 37 weeks of pregnancy are completed—like Baby Chandler—are defined as

"premature" or "preterm." The WHO estimates that about 15 million babies are born preterm every year and that number is rising.

22.     Proper nutrition for preterm babies, like Baby Chandler, is vital.

23.     The market for infant formula and fortifiers in this country is vast given that the United States ranks in the top ten countries in the world with respect to the number of preterm births.

24.     Originally, cow's milk-based products were believed to be good for the growth of premature, low birth weight babies. But science and research have uncovered the significant dangers of the Defendants' cow's milk-based products. These dangers include causing NEC and other health complications to preterm babies, and substantially contributing to death of preterm babies.

25.     Defendants knew of this science and research as it developed but chose not to change their products or any of the products' packaging, guidelines, instructions, or related warnings.

26.     Further to the point, scientific advances have led the way to alternative formulas and fortifiers derived from human milk and non-bovine based products. These alternative products avoid the problems associated with cow's milk-based products, including NEC and death to premature babies.

27.     The Defendants knew of these alternative formulas and fortifiers and knew they were safer than cow's milk-based products for premature babies. Yet

the Defendants continued to promote and sell their dangerously defective cow's milk-based products without proper warnings.

28.     NEC is a devastating disease. It is the most frequent and lethal gastrointestinal disorder affecting preterm infants. NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and die. Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis. Up to thirty percent of NEC-diagnosed infants die from the disease.

29.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems. Extensive scientific research, including randomized controlled trials, confirms that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants. This, in turn, leads to other medical complications, surgeries, long-term health problems, and, in some cases, death.

30.     For example, in one randomized, multicenter study of 926 preterm infants, cow's milk formula-fed babies were *six to ten* times more likely to develop NEC than preterm infants fed only human breast milk. The preterm infants fed cow's milk-based formula were also *three times* more likely to develop NEC than babies fed a combination of cow's milk-based formula and breast milk. For babies

born at more than thirty weeks gestation, NEC was *twenty times more common* in those only fed cow's milk formula.

31. Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were *90% less likely* to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

32. A 12-center randomized trial concluded that fortifying breast milk with cow's milk-based fortifier caused a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death compared to fortification with a breast milk-based fortifier.

33. A Surgeon General report, *The Surgeon General's Call to Action to Support Breastfeeding* warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis." The report also states that premature infants not breastfed are *138% more likely* to develop NEC.

34. The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," advises that *all* premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk. This recommendation is based on the "potent benefits of human milk," including "lower rates of … NEC."

35.     A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC **21% of the time.**

36.     Yet another study compared extremely preterm infants who were given a diet of either (a) breast milk fortified with a breast milk-based fortifier, or (b) variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC only 5% of the time. The babies given cow's milk products suffered NEC 17% of the time. In other words, the babies fed cow's-milk based products were *three times more likely* to develop NEC.

C.     **Defendants' False and Misleading Marketing Regarding Cow's Milk-Based Infant Feeding Products**

37.     Defendants aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent to breast milk, including prior to Baby Chandler's birth.

38.     Defendants targeted their marketing to parents of preterm infants while still in the hospital with their preterm babies. Defendants marketed their cow's milk-based formulas and fortifiers as necessary for the growth and development of preterm infants. Defendants implicitly discouraged mothers from breastfeeding, which, in turn, reduced the mother's supply of breast milk. The

Defendants never referenced the science showing that their cow's milk-based products significantly increased the risk of preterm babies developing NEC.

39.     Studies show the impact that formula advertising has on the rates of initiation and continuation of breastfeeding. This includes the fact that as "hand-feeding" (non-breastfeeding) advertising increases, breastfeeding rates decrease the year after.

40.     No doubt aware of the effect of their advertising, Defendants, along with other formula manufacturers, spend massive sums to disseminate their message. One study estimates that formula manufacturers, collectively, spent $4.48 billion on marketing and promotion in 2014 alone.

41.     Recognizing dangers of deceptive infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization (the "WHO")—developed the International Code of Marketing of Breast-milk Substitutes (the "Code"). The Code required companies to acknowledge the superiority of breast milk; the negative effect on breastfeeding of introducing partial bottle-feeding; and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the public. The advertising ban included prohibiting formula manufacturers from providing sample products to mothers or members of their families.

42. Defendants acknowledge the Code on their websites and claim to support the WHO's effort to encourage breastfeeding. Yet this is little more than lip service. While claiming to support the WHO's Code on their website, Defendants aggressively market to new parents' darkest fears — that the nutrition they are supplying their child will not provide the best chance of survival. The Defendants are knowingly choosing *not* to warn parents that using the Defendants' products will significantly increase the risk of NEC.

43. For example, Abbott stated on its website, on a page titled "Infant Formula Marketing," that:

> We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—**infant formula is the only appropriate, safe alternative** to meet babies' nutritional needs.

44. Abbott's statement on its website is a prime example of choosing to ignore the existence of donor milk, as well as human milk-based formula.

45. Abbott markets and sells multiple products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 2.0, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to help underdeveloped babies reach their growth targets. For example, on its (since-

edited) webpage about Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet Abbott does not mention that these cow's milk-based products significantly increase the risk of NEC. At some point, the website was edited to remove this statement. But upon information and belief, the statement remained on the website until at least December 2020.

46.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free formula, coupons, and even entire gift baskets to parents in hospitals, medical clinics, and residential charities where out-of-town families stay while their babies receive long-term treatment in the NICU.

47.     Through this early targeting, Defendants create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital. This advertising tactic results in increased expenses for parents, significantly increased risks for babies, and (vastly) increased profits for Defendants. Defendants' gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their health

care professionals. These underhanded marketing tactics dramatically reduce breastfeeding rates.

48.     Further, when Defendants recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, they developed a product called "Similac Human Milk Fortifier." This product name is misleading. Although the title suggests that it derives from human milk, the product, in fact, only contains cow's milk-based ingredients. One study, for example, found that only about 8% of parents surveyed in the NICU interpreted "human milk fortifier" as being a cow's milk-based product. Samples of this misleading product are set out below:




49.     Defendants designed powerful, misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe for preterm infants to use; (2) cow's milk-based products are equal to or superior to

breast milk-based products; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider Defendants' cow's milk-based products a first choice. Defendants employ this marketing scheme despite knowing that their cow's milk-based products pose an extreme risk of NEC and death to preterm infants like Baby Chandler. These marketing tactics go beyond a mere failure to warn — they are intentionally deceptive.

**D.    Defendants' Inadequate Warnings**

50.    As demonstrated above, Defendants aggressively market its cow's milk-based products to convince parents that its products are safe and necessary for the growth of premature infants. But as Defendants well knows, its cow's milk-based products are in fact extremely dangerous for premature infants in that they significantly increase the risk of NEC, injury, and death.

51.    The cow's milk-based products Defendants market specifically for premature infants are available at retail locations and online. No prescription is necessary.

52.    Despite knowing that its Similac, cow's milk-based products cause NEC, injury, and death in preterm infants, Defendants failed to properly warn parents of this risk. Defendants likewise did not provide proper instructions or guidance for how to avoid NEC.

14

53.     Defendants deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its Similac, cow's milk-based products were a safe and necessary alternative, supplement or substitute to breast milk.

54.     Despite knowing that its cow's milk-based products were being fed to premature infants, often without the parents' informed consent, Defendants failed to require or recommend that medical professionals or hospitals inform parents of the significant risk of NEC or to require that parental consent be obtained before the products being fed to their babies.

E.     **Safer Alternative Designs**

55.     There are a range of alternative options for preterm to be fed exclusively human milk-based nutrition. For example, along with a mother's own milk, established networks of providers deliver donated, pasteurized breast milk to hospitals nationwide. Hospitals also have access to shelf-stable formula and milk fortifiers derived from pasteurized breast milk.

56.     As an example, Prolacta Bioscience, a different baby formula manufacturer, makes breast milk-based feeding products specifically designed for preterm infants that contains no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based

products provide, without the unreasonably dangerous and deadly effects of NEC, injury, or death.

57.    A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants, eliminating the risks associated with cow's milk-based products.

58.    In a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met their growth targets. This showed that premature infants *can* achieve and exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

59.    Another study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is linked to significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

60.    Defendants' products not only threaten infants' health, but also displace the breast milk infants could otherwise receive. This displacement only increases infants' vulnerability to NEC; studies show that breast milk protects against the disease.

16

61.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

62.     Despite the Defendants knowing that their cow's milk-based products presented a dire threat to the health and development of preterm infants, they made no changes to their products. Nor did the Defendants modify their products' packaging, guidelines, instructions, or warnings. Instead, Defendants continued to market and sell their unreasonably dangerous products to unsuspecting parents and healthcare providers, generating vast profits as a result.

63.     Defendants' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. Defendants could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

64.     On information and belief, Defendants were aware of the significantly increased risk of NEC, injury, and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, or designing a safer product, Defendants continued aggressively market and sell their cow's milk-based products.

## COUNT 1
### STRICT LIABILITY: FAILURE TO WARN

65.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

66.     As the manufacturers and/or sellers of the cow's milk-based formula and fortifier products described herein, Defendants owed a duty to warn foreseeable users, including Plaintiff and Baby Chandler, about the dangers of Defendants' cow's milk-based products causing NEC, injury, and death to premature infants because Defendants either knew, or should have known, of these risks at the time they manufactured, marketed, and sold these products.

67.     Defendants' duty to warn is part of its general duty to design, manufacture, and sell products that are reasonably safe for their foreseeable uses. In manufacturing, marketing, and selling their Similac infant formulas and fortifiers with cow's milk-based ingredients, Defendants had a duty to adequately warn of the unreasonable risk of harm posed by such products and, specifically, the increased risk of NEC, injury, and death to preterm infants.

68.     Defendants failed to adequately warn of the risks posed by their cow's milk-based products, making the products unreasonably dangerous, in at least the following ways:

   a. Choosing not to adequately warn Plaintiff that feeding preterm infants with **cow's milk-based formula** and fortifier products

significantly **increases infants' risk** of suffering NEC, injury, and death;

b.  Choosing not to adequately warn Plaintiff that numerous **scientific studies** showed that feeding preterm infants with **cow's milk-based formula** and fortifier products significantly **increases infants' risk** of suffering NEC, injury, and death;

c.  Choosing not to adequately warn the Plaintiff that feeding preterm infants **with human milk-based formula** and fortifier products **significantly decreases** infants' risk of suffering NEC, injury, and death when compared to cow's milk-based products;

d.  Choosing not to adequately warn the Plaintiff that numerous **scientific studies** showed that feeding preterm infants with **human milk-based formula** and fortifier products significantly **decreases** infants' risk of suffering NEC, injury, and death when compared to cow's milk-based products;

e.  Choosing not to adequately warn **physicians and healthcare** providers that feeding preterm infants with cow's milk-based formula and fortifier products **significantly increases** infants' risk of suffering NEC, injury, and death;

f.  Choosing not to adequately warn **physicians and healthcare providers** that numerous **scientific studies** showed that feeding preterm infants with cow's milk-based formula and fortifier products significantly **increases** infants' risk of suffering NEC, injury, and death;

g.  Choosing not to adequately warn **physicians and healthcare providers** that feeding preterm infants with **human milk-based** formula and fortifier products significantly **decreases** infants' risk of suffering NEC, injury, and death when compared to cow's milk-based products;

h.  Choosing not to adequately warn **physicians and healthcare providers** that numerous **scientific studies** showed that feeding preterm infants with **human milk-based formula** and fortifier products significantly **decreases** infants' risk of suffering NEC, injury, and death when compared to cow's milk-based products;

19

i.   Failed to provide detailed instructions to NICUs and physicians on when to stop feeding Similac;

j.   Choosing to provide inadequate guidance and instructions to parents on when to start using cow's milk-based feeding products, how much to use, when to increase or decrease use, the volume and timing of feeds, when not to feed, and/or when to stop feeding their products to premature infants;

k.   Choosing not to provide periodic or yearly safety reports or risk-benefit analyses on feeding cow's milk-based infant feeding products to premature infants;

l.   Choosing not to develop an adequate protocol for hospitals and physicians to assure safe use; and/or

m.  Choosing not to provide detailed and adequate instructions on proper use, administration, application, and limitations of their products specifically designed for premature infants.

69.   Moreover, had physicians and healthcare providers known of the extreme risk associated with feeding premature infant cow's milk-based formula, they would not have provided or suggested such a dangerous product to the Plaintiff, nor would they have fed such a dangerous product to Baby Chandler.

70.   The Defendants' cow's milk-based products provided and/or sold to the Plaintiff were unreasonably and defectively dangerous at the time the products left the Defendants' control, and were, at all times material, used in a reasonably foreseeable manner.

71.   Defendants' conduct as described herein also violates Ind. Code. §24-5-0.5, *et seq*.

20

72.     As a direct and proximate result of Defendants' failure to adequately warn the public about the unreasonable risks associated with the Defendants' cow's milk-based products, including Plaintiff, Baby Chandler developed NEC, suffered severe injuries, and died.

**COUNT 2**
**STRICT LIABILITY: DESIGN DEFECT**

73.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

74.     As the manufacturers and/or sellers of the cow's milk-based formula and fortifier products described herein, Defendants owed a duty to foreseeable users, including the Plaintiff, to design reasonably safe infant feeding products.

75.     Defendants knew that their cow's milk-based products would be used to feed premature infants, including Baby Chandler.

76.     Defendants knew, or reasonably should have known, that feeding premature infants cow's milk-based products would substantially increase the risk of the infants developing NEC and suffering severe injuries and deaths, including the Baby Chandler.

77.     Despite this knowledge, Defendants did nothing to alter the design of their infant feeding products to make them safer for use by premature infants, including Baby Chandler. Instead, Defendants doubled down and increased their

efforts to market their cow's milk-based infant feeding products to the parents of premature infants, including the Plaintiff here.

78.     Defendants' cow's milk-based formula and fortifier products were defectively designed as they were:

      a.  unreasonably dangerous to premature infants, including Baby Chandler;

      b.  not reasonably suited for their intended use of providing much-needed nutrition to premature infants, including to Baby Chandler;

      c.  not merchantable; and

      d.  the products had risks that exceeded a reasonable consumer's expectations.

79.     Baby Chandler was fed Abbott's unreasonably dangerous cow's milk-based infant feeding products, including cow's milk-based infant formula and/or fortifier. An ordinary consumer would not expect these products to carry a significant risk of causing NEC, severe injuries, or death.

80.     Defendants knew (or reasonably should have known) that human breast milk-based formula and fortifier products did not carry the same risks of causing NEC, severe injuries, or death, as cow's milk-based formula and fortifier products.

81.     Defendants knew that scientific data and well researched studies showed that cow's milk-based infant feeding products (like Defendants infant

feeding products) carried unreasonable risks of causing NEC, severe injuries, and death, yet Defendants continued to market and sell their defective products to the parents of premature babies, including Plaintiff.

82. Defendants chose not to develop a human milk-based product that they knew would be safer for premature infants, nor did Defendants reformulate their products to reduce the risk of NEC, injury, or death.

83. The cow's milk-based products designed by Defendants and fed to Baby Chandler were unreasonably and defectively dangerous at the time the products left Defendants' control, and were, at all times material, used in a reasonably foreseeable manner.

84. Defendants' conduct as described herein also violates Ind. Code. §24-5-0.5, *eq seq*.

85. As a direct and proximate result of consuming Defendants defectively designed infant feeding products, Baby Chandler developed NEC and suffered severe injuries and died.

86. As a direct and proximate result of the tortious conduct described herein, Plaintiff seeks to recover the damages identified below.

## COUNT 3
## NEGLIGENT DESIGN, MANUFACTURING, AND WARNINGS

87. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

88.     Defendants, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, including Plaintiff and Baby Chandler here, to exercise reasonable care in designing and manufacturing their cow's milk-based infant feeding products, and in warning consumers of the risks posed by those products — i.e., the risk to premature babies of developing NEC and suffering injuries and death as a result of using the product.

89.     At all times relevant to this action, Plaintiff and Baby Chandler used the Defendants' cow's milk-based infant feeding products in their intended manner and for their intended purpose.

90.     Defendants negligently designed and manufactured their cow's milk-based infant feeding products, and negligently failed to warn about the risks of using their cow's milk-based infant feeding products, thereby breaching their duties to the public, in at least the following ways:

    a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.  Failing to warn that cow's milk-based products are unsafe and/or contra-indicated for premature infants like Baby Chandler; and/or

    c.  Carrying warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions but do not warn of the significantly increased risk of NEC and death; and/or

    d. Failing to carry a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

    e. Failing to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed Defendants' products, notwithstanding their substantial risks; and/or

    g. Failing to provide a warning in a method reasonably calculated or expected to reach the baby's parents; and/or

    h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

91. In addition, although Defendants knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

92. As a direct and proximate result of consuming Defendants negligently designed and manufactured infant feeding products, Baby Chandler developed NEC and suffered severe injuries and died.

25

93.     As a direct and proximate result of the tortious conduct described herein, Plaintiff seeks to recover the damages identified below.

**COUNT 4**
**INTENTIONAL MISREPRESENTATION**

94.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

95.     Defendants, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, including Plaintiff and Baby Chandler, to provide truthful, accurate, material information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

96.     Defendants breached their duty by intentionally misrepresenting the safety of their products in their advertising and promotional materials, as described in previous paragraphs and incorporated herein.

97.     Plaintiff and Baby Chandler were foreseeable and intended recipients of the Defendants' misrepresentations.

98.     Defendants made the following false statements of material fact on an ongoing and repeated basis and prior to the time Baby Chandler was fed their products.

      a.  that their cow's milk-based products were safe and beneficial for premature infants, which they knew to be untrue;

b. that their cow's milk-based products were necessary to the growth and nutrition of premature infants, which they knew to be untrue;

c. that their products have no serious side effects when fed to premature infants, which they knew to be untrue;

d. that cow's milk-based products are safe for premature infants, which they knew to untrue;

e. that cow's milk-based products were necessary for optimum growth of premature babies, which they knew to be untrue;

f. that cow's milk-based products were similar or equivalent to breast milk, which they knew to be untrue;

g. that their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk, which they knew to be untrue; and/or

h. that their products were based on up-to-date science, making them safe for premature infants, which they knew to be untrue.

99.  Defendants knew those misrepresentations were false.

100.  Defendants' misrepresentations were intended to, and in fact did, induce hospitals, health care providers, and parents of premature infants, including Plaintiff, to feed Defendants' cow's milk-based products to their premature children, including Baby Chandler.

101.  Plaintiff did not know that the representations made by Defendants were false and had no reason to believe the representations were false. Therefore, Plaintiff reasonably relied on Defendants' misrepresentations.

102.  Defendants' misrepresentations induced Plaintiff to feed Baby Chandler with the Defendants' cow's milk-based infant feeding products. Plaintiff

did so because they believed the Defendants' messaging about the relative safety of their cow's milk-based infant feeding products.

103.    Plaintiff and Baby Chandler suffered a detriment from relying on the Defendants' misrepresentations as the Defendants' cow's milk-based products were fed to Baby Chandler and caused her to develop NEC and suffer severe injuries and die.

104.    As a direct and proximate result of the tortious conduct described herein, Plaintiff seeks to recover the damages identified below.

## COUNT 5
## NEGLIGENT MISREPRESENTATION

105.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

106.    Defendants, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, including Plaintiff and Baby Chandler, to provide truthful, accurate, material information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

107.    Defendants breached their duty by negligently misrepresenting the safety of their products in their advertising and promotional materials, as described in previous paragraphs and incorporated herein.

108.    Plaintiff and Baby Chandler were foreseeable and intended recipients of the Defendants' misrepresentations.

109.    Defendants made the following false statements of material fact on an ongoing and repeated basis and prior to the time Baby Chandler was fed their products.

   a.  that their cow's milk-based products were safe and beneficial for premature infants, which they knew to be untrue;

   b.  that their cow's milk-based products were necessary to the growth and nutrition of premature infants, which they knew to be untrue;

   c.  that their products have no serious side effects when fed to premature infants, which they knew to be untrue;

   d.  that cow's milk-based products are safe for premature infants, which they knew to untrue;

   e.  that cow's milk-based products were necessary for optimum growth of premature babies, which they knew to be untrue;

   f.  that cow's milk-based products were similar or equivalent to breast milk, which they knew to be untrue;

   g.  that their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk, which they knew to be untrue; and/or

   h.  that their products were based on up-to-date science, making them safe for premature infants, which they knew to be untrue.

110.    Defendants knew or should have known those misrepresentations were false.

111.    Defendants' misrepresentations were intended to, and in fact did, induce hospitals, health care providers, and parents of premature infants, including Plaintiff, to feed the Defendants' cow's milk-based products to their premature children, including Baby Chandler.

112.    Plaintiff did not know that the representations made by Defendants were false and had no reason to believe the representations were false. Therefore, Plaintiff reasonably relied on Defendants' misrepresentations.

113.    Defendants' misrepresentations induced Plaintiff to feed Baby Chandler with the Defendants' cow's milk-based infant feeding products. Plaintiff did so because they believed the Defendants' messaging about the relative safety of their cow's milk-based infant feeding products.

114.    Plaintiff and Baby Chandler suffered a detriment from relying on the Defendants' misrepresentations as the Defendants' cow's milk-based products were fed to Baby Chandler and caused her to develop NEC and suffer severe injuries and, die.

115.    As a direct and proximate result of the tortious conduct described herein, Plaintiff seeks to recover the damages identified below.

## COUNT 6
## BREACH OF IMPLIED WARRANTIES

116.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

117.    At all times relevant to this action, Plaintiff and Baby Chandler used the products at issue in their intended manner and for their intended purpose.

118.    The allegations contained in previous paragraphs set forth specific representations Defendants have made to consumers, physicians, and medical staff through their advertising and promotional materials. The allegations contained in those paragraphs are incorporated herein.

119.    Defendants implicitly warranted, through direct-to-consumer marketing, advertising, and labels, that their products were safe and effective for reasonably anticipated uses, including use by premature infants.

120.    Defendants implicitly warranted that their products were similar or equivalent to human milk.

121.    Defendants implicitly warranted that their products were necessary for growth.

122.    Defendants implicitly warranted that their products were safe based upon current data and science.

123.    Defendants' products did not conform to these implied representations because they cause serious injury when used to feed premature infants.

124.    Defendants' products were fed to Baby Chandler, causing him to develop NEC and suffer injuries, and die.

31

125.   As a direct and proximate result of the tortious conduct described herein, Plaintiff seeks to recover the damages identified below.

**COUNT 7**
**VIOLATION OF INDIANA'S**
**DECEPTIVE CONSUMER SALES ACT**

126.   Plaintiff incorporates the preceding paragraphs as if set out fully herein.

127.   At all times material, Plaintiff and Baby Chandler were consumers within the meaning of Ind. Code. §24-5-0.5 *et seq.*, because they purchased goods—cow's milk-based infant feeding products—from the Defendants.

128.   Defendants violated Indiana's Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5, *et seq.*, by engaging in false, misleading, or deceptive acts or practices in their trade and commerce, and by taking advantage of the public's lack of knowledge about cow's milk-based infant feeding products to a grossly unfair degree.

129.   Specifically, Defendants represented that their cow's milk-based infant products had characteristics, uses, and benefits to preterm infants which they do not in fact have. That is, the Defendants represented that their cow's milk-based infant feeding products were safe and beneficial to feed to premature infants, when in fact they were not. The Defendants knew that their cow's milk-based infant feeding products were unsafe for use by premature infants because it

substantially increased the risk of the infant developing NEC, suffering severe injuries, and potentially dying. The Defendants not only knew this fact and concealed it, but represented the exact opposite to the public — i.e., that the products were safe to use with premature infants.

130. Defendants' misrepresentations were intentional as they were actually aware of the falsity and deceptive nature of their advertising, and specifically intended for consumers to detrimentally rely on the advertising. Alternatively, Defendants demonstrated such a flagrant disregard of prudent and fair business practices to the extent that they should be treated as having acted intentionally.

131. Defendants' misrepresentations induced Plaintiff to feed Baby Chandler (or to allow her children to be fed) Defendants' cow's milk-based infant feeding products. Plaintiff justifiably relied on the Defendants' misrepresentations to Baby Chandler's detriment.

132. Had Defendants not made unlawful misrepresentations, Baby Chandler would not have been exposed to Defendants' unreasonably dangerous cow's milk-based products.

133. As a direct and proximate result, Defendants' products were fed to Baby Chandler, causing him to develop NEC and suffer severe and permanent injuries and ultimately his death.

134.   As a direct and proximate result of the tortious conduct described herein, Plaintiff seeks to recover the damages identified below.

## DAMAGES FOR PLAINTIFF

135.   Plaintiff Amanda Martinez, as the surviving mother of her deceased minor child, Chandler Love, seeks the following damages on behalf of all of Chandler Love's statutory survivors:

> a.   all past and future pecuniary losses, including the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Amanda Martinez and all other statutory survivors would have received from Chandler Love had he lived;
>
> b.   all past and future loss of companionship and society, including the loss of love, comfort, companionship, and society that Amanda Martinez and all other statutory survivors would have received from Chandler Love had he lived;
>
> c.   all past and future mental anguish suffered by Amanda Martinez and all other statutory survivors caused by the death of Chandler Love, including all emotional pain, torment, and suffering; and
>
> d.   all damages awardable under Indiana's Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5, *et seq.*

## DEMAND FOR JURY TRIAL

136.   Plaintiff demands a trial by jury for all actions so triable.

WHEREFORE, Plaintiff Amanda Martinez, as the surviving mother of her deceased minor child, Chandler Love, demands the Court enter judgment against Defendants Abbott Laboratories Inc., and Abbott Laboratories.

Date: August 11, 2023.

Respectfully submitted,

**RATZAN WEISSMAN & BOLDT**
2850 Tigertail Avenue, Suite 400
Coconut Grove, Florida 33133
Telephone: (305) 374-6366
stuart@rwblawyers.com
eservice.legal@rwblawyers.com

By: /s/ Stuart N. Ratzan
      STUART N. RATZAN
      Florida Bar No. 911445
      KIMBERLY L. BOLDT
      Florida Bar No. 957399